# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| **ARTEMUS EDEN,** | |
| Plaintiff-Appellee | |
| v. | **Case No. 25-7133** |
| **STATION TOWNHOUSES LLC, et al.,** | |
| Defendants-Appellants | |

## DEFENDANTS-APPELLANTS' EMERGENCY MOTION FOR STAY OF PRELIMINARY INJUNCTION ORDER PENDING APPEAL

Defendants-Appellants Station Townhouses LLC and Bozzuto Management Company (together, "BMC") respectfully move for an immediate stay of the preliminary injunction Order entered by the district court on September 12, 2025.

The district court granted a mandatory preliminary injunction to restore Plaintiff, a known violent criminal and harasser, into a community where he presents a material risk of harm to others. In granting this extraordinary relief, the district court failed to correctly apply the required legal standard for preliminary injunctions under *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). The district court's Order presents an appropriate opportunity for this Court to clarify a longstanding legal issue—whether a movant for a preliminary injunction must satisfy all four *Winter* elements independently. *See Clevinger v.*

*Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235-36 (D.C. Cir. 2025) (observing that "we have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said," and acknowledging that "[o]ne day, we will need to answer that question"). The district court's Order departed from the standard in *Winter* and, in so doing, ordered an admitted abuser back into the community of those very persons to whom he poses a threat, including four United States Senators. The judicial system should not bend establish rules to favor the rights of an admitted harasser and criminal ***over*** the safety of third parties and elected public officials.

The district court's Order, which is premised on an alleged wrongful eviction, requires BMC to reinstate Plaintiff-Appellee Artemus Suarez, who calls himself Artemus Eden ("Eden"), to a rental unit at Station House that he formerly occupied but abandoned months ago after he was arrested for sexual assault, stalked United States Senators, was charged with other crimes, and was held for months at Saint Elizabeths Hospital. Despite that Eden forfeited his housing voucher and no longer is eligible to reside at Station House (and certainly will not be paying for the unit), the Order requires BMC to turn over the keys to Unit 943 ***by noon on Monday, September 15, 2025***.[1] However, as BMC's presentation at

---

[1] Because the district court entered its ruling on September 12, with BMC obligated to admit Eden to the property on September 15, undersigned counsel

the September 11, 2025 preliminary injunction hearing made abundantly clear, Eden poses a serious risk to the safety and wellbeing of Station House personnel and the hundreds of residents who call the property home, including the four resident United States Senators and their families.

This appeal presents significant legal issues—namely, whether the district court can impose a mandatory preliminary injunction ***without*** finding that the movant has prevailed on all four *Winter* elements, as well as practical health and safety concerns about whether Eden's claimed interests outweigh the unrebutted threats to the residents at Station House.  The district court recognized the risk, including to U.S. Senators, but concluded that certain conduct restrictions in its preliminary injunction Order would mitigate the risk.  Yet Eden, who has little regard for authority or boundaries, has not even acknowledged the string of alleged offenses that led to his incarceration and commitment to Saint Elizabeths earlier this year.  Rather, on cross-examination at the September 11 hearing, Eden denied any recollection of most of these incidents, including his alleged vicious sexual assault of a sleeping homeless woman.

BMC and the Station House community should not be required to stand by and wait for Eden to commit his next act of violence.  And because the district

---

could not comply with the ordinary seven-day requirement for emergency motions under Circuit Rule 27(e).

court **did not find** (and could not find) that Eden had carried his burden on all four elements of the preliminary injunction standard but instead found only that Eden was likely to prevail on the merits and likely to establish irreparable harm, the district court erred in entering preliminary injunctive relief. The Court should stay the preliminary injunction Order and expedite briefing in this appeal.

## Factual Background and Procedural History[2]

Eden resided at Station House from 2020 until his arrest in 2025. As the district court found, Eden engaged in a "pattern of erratic, threatening, and harassing behavior."[3] (Ruling at 8, Ex. A.) Most significantly, in 2024, Eden began stalking United States Senators who reside at Station House. In early 2025, Eden posted a disturbing flyer on a Senator's door. A copy of that flyer was admitted into evidence at the preliminary injunction hearing as Exhibit 28 and is attached here as Exhibit C. Special Agent Jesse Cole with the United States

---

[2] Citations to hearing testimony are to the rough transcripts, as undersigned counsel have not yet received the certified transcripts.

[3] Uncontroverted testimony at the hearing establish a pattern of escalating inappropriate behavior. Eden would sexually harass the property manager, lifting his shirt to "show off his weight loss" and making flirtatious comments such as, "where's my ring at?" (9/11/25 Tr. 123, Ex. B.) He would yell at the manager, getting so close to her face that a resident in a wheelchair would intervene by positioning herself between the two of them. (9/11/25 Tr. 123.) Eden also sexually harassed a property concierge, including by flinging condoms at her and threatening to "f*ck Bozzuto," and by calling her a "stallion" and an "African goddess." (9/11/25 Tr. 107, 109.)

4

Capitol Police testified that his agency conducted a threat assessment with respect to Eden and found a threat to exist. (9/11/25 Tr. 50.) Agent Cole elaborated that the risk arose from Eden's (i) irrational fear of foreign intelligence services infiltrating BMC in a manner that would breach the safety of the Senators' apartments; (ii) "intensity of effort," including by communicating with the Senators through multiple modalities; (iii) lack of boundaries; and (iv) target focus, which was "high." (9/11/25 Tr. 52-53.) Indeed, just ***one day*** before the preliminary injunction hearing—but after Eden was on notice that the district court would be evaluating the risk he presented to the community—Eden assaulted a Senate staffer by poking her in the chest. (9/11/25 Tr. 53.)

At the same time, Eden's criminal conduct toward others escalated to violent crimes and threats. On March 28, 2025, Eden was arrested for an alleged sexual assault committed inside his apartment. (Ruling at 1.) Detective James Payne with the D.C. Metropolitan Police Department testified that the victim, a homeless woman, described Eden as having assaulted her by placing an item inside her vagina. (9/11/25 Tr. 97.) Detective Payne further testified that, according to Eden, he had "engaged in masturbation" while watching his victim. (9/11/25 Tr. 100.)

Although the sexual assault charge was eventually nolle prossed for reasons not in the record, other criminal charges against Eden in early 2025 stuck. In Case No. 2025 CMD 003196, Eden was charged in the D.C. Superior Court with

5

unlawful entry on private property after making a threat to the chief of the

Metropolitan Police Department and subsequently attempting to gain access to a

police facility despite being barred from entry.  Detective Martin Dominguez with

the Metropolitan Police Department testified that Eden had phoned the internal

affairs division to report that "he was a threat to the chief," that this was "not a

complaint, that it was a threat, and that he was on his way."  (9/11/25 Tr. 87-88.)

In Case No. 2025 CMD 003197, Eden was charged in the D.C. Superior Court

with theft after he stole paperwork containing sensitive information about Station

House residents from the concierge desk.  A video capturing the theft, which was

admitted into evidence as Exhibit 26, is available at https://tinyurl.com/edentheft.[4]

Following Eden's arrest for sexual assault of a homeless woman, he was

found incompetent to stand trial and committed to Saint Elizabeths until

mid-August 2025.  (Ruling at 1.)  He ultimately pled guilty to the theft offense as

part of a plea deal that also resolved the police stalking offense.  (*See* Ruling at 1.)

---

[4]  This testimony about Eden's criminal acts and threats to others was not
contested—not even by Eden himself. When undersigned counsel questioned Eden
about his crimes, he claimed not to recall being charged with sexual assault, or
being charged with trespass on police property, or earlier incidents in which he had
been charged with assaulting a woman on North Capitol Street (Case No. 2024
CMD 007377) and with assaulting and threatening an out-of-town visitor (Case
No. 2025 CMD 003414).  (9/11/25 Tr. 27-31.)  Eden initially claimed not to recall
his theft crime either, though after being confronted with the video—which depicts
him stealing sensitive BMC records—Eden changed his tune and asserted that,
really, he was just looking out for the U.S. Senators whose residential information
may have been included among the records he stole.  (9/11/25 Tr. 33-34.)

6

While Eden was absent from his apartment for months, with no clear direction from his lawyer (who was then fighting multiple eviction cases) as to when or if he might return (Ruling at 3), BMC learned that Eden's housing voucher had been terminated by the D.C. Housing Authority, and that Eden had not timely appealed the termination (Ruling at 2). With no sign of Eden and no funding for his unit, and with growing concern about the conditions of the unit, BMC entered the unit and discovered it in "complete disarray: cockroaches, dishes in the sink, no furniture except a bed, empty food containers, and no food in the refrigerator." (Ruling at 2.) The Station House property manager testified that the cockroach infestation had spread to other parts of the building, and that the conditions of Unit 943 were so deplorable that she was forced to don a hazmat suit before entering. (9/11/25 Tr. 127.)

Based on the totality of the circumstances, including Eden's long and undefined absence, the uninhabitable state of Unit 943, and the termination of Eden's voucher, BMC deemed the unit abandoned and retook possession in late July. Following his plea deal in late August, Eden returned to Station House, learned that the unit had been turned over, and sued BMC for wrongful eviction in D.C. Superior Court. BMC removed on the basis of diversity, and Eden thereafter moved for a mandatory preliminary injunction requiring BMC to place him back in Unit 943 while the litigation plays out. The district court held an evidentiary

7

hearing on September 11, and ruled on September 12 that Eden was entitled to a preliminary injunction because (in the court's view) Eden had established a likelihood of success on the merits and a risk of irreparable harm. The court did not find that either the balance of hardships or the public interest favored Eden's position, but instead held that the hardships BMC would suffer—including "loss of rents, and that its staff and residents would once more be exposed to [Eden's] erratic and harassing behavior," do "not outweigh Mr. Eden's success on the first two most important factors." (Ruling at 10.)

BMC moved the district court to stay its Order pending BMC's appeal, and flagged in open court BMC's intention to seek an emergency stay in the D.C. Circuit.[5] (9/12/25 Tr. 10, 25-26, Ex. D.) The district court denied BMC's request for a stay, opining that this Court is unlikely to find that Eden abandoned Unit 943, that BMC would not be irreparably harmed pending this Court's resolution of any emergency motion presented to it, and that a stay would cause Eden irreparable harm given his unhoused status. (9/12/25 Tr. 26-27.) The district court entered its preliminary injunction Order on September 12. (9/12/25 Tr. 26.) BMC noted an appeal that same day.

---

[5] This representation, made in the presence of Eden and his counsel, should satisfy the notice requirement of Circuit Rule 8(a)(2).

## Legal Standard

When considering whether to stay a lower court order, this Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 425-26 (2009).

## Argument

### I.    BMC is likely to succeed on the merits in establishing that the district court erred in issuing a preliminary injunction.

The district court made at least two related errors in its preliminary injunction ruling.[6]  First, the district court entered a preliminary injunction notwithstanding that it did not find the balance of hardships or the public interest favored immediate relief for Eden.  Quite the contrary, the court recognized that "Mr. Eden's pattern of erratic, threatening, and harassing behavior—including possible criminal conduct—creates some risk for Defendants, their staff, and

---

[6]  By focusing on these errors, which render the preliminary injunction Order procedurally defective, BMC does not concede that the district court's analysis was otherwise correct.  Indeed, BMC disagrees with the district court's findings as to Eden's likelihood of success on the merits and the risk of irreparable harm.  But this Court need not even consider those findings, let alone decide whether they constitute reversible error, because the district court applied the wrong standard overall.

9

residents." (Ruling at 8.)  Yet the court found that Eden's success on the first two elements of the preliminary injunction framework set forth in *Winter* outweighed BMC's showing as to the second two elements.  (Ruling at 10.)  In its preliminary injunction Order, the court elaborated:  "Neither the balance of harms nor the public interest, individually or together, outweigh Plaintiff's success on the first two injunction factors."  (Order at 1, Ex. E.)

The law is settled, though, that a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  No matter how strong a showing a plaintiff makes on any one element of the test, the plaintiff must prevail on *each* element.  This heavy burden is appropriate, because a preliminary injunction is "an extraordinary remedy never awarded as of right."  *Id.* at 24.

The district court remarked that it "remains an open question whether the sliding-scale approach that the D.C. Circuit adopted long ago still applies." (Ruling at 4.)  That may be true as a technical matter, although as this Court recently observed, it is "questionable that the sliding scale approach remains good law after 2008, when the Supreme Court decided *Winter v. Natural Resources Defense Council, Inc.*  That opinion can be read to require movants to establish

10

*each* preliminary injunction factor independently." *Clevinger*, 134 F.4th at 1235; *see also id.* at 1235-36 (marveling that "we have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said," and acknowledging that "[o]ne day, we will need to answer that question").

In any event, the district court's reasoning would not even withstand the classic formulation of the sliding-scale approach, which "allowed that a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The court did not hold that Eden made a strong showing on the first two elements and a weaker showing on the second two. The court held that Eden made a strong showing on the first two elements that swallowed up the other two. That approach cannot be squared with *Winter*, particularly because it downplays the impact of preliminary injunctive relief on innocent third parties.

Imagine, for instance, a blighted building that presents an extreme public safety risk to a neighborhood down on its luck. Imagine that an out-of-state owner of the building persuades a federal court that some procedural error rendered a condemnation order defective and that the owner, despite not residing in the property, would be in some sense "irreparably harmed" if the building were torn down. Could a federal court stop there and enter an injunction prohibiting demolition? Of course not. The court necessarily would proceed to consider the

11

ramifications to the surrounding community if demolition were delayed by months or years while litigation played out.

The same logic applies here.  Actually, it applies with greater force, and here lies the district court's second procedural error:  while the court paid lip service to the idea that mandatory preliminary injunctions require "greater wariness" than those that would preserve the status quo (Ruling at 5), the court's opinion does not manifest any application of that principle.  Rather, the court scolded BMC for trying to "secure the relief they seek through equitable considerations instead of the statutorily mandated process" for eviction.  (Ruling at 9.)  Put differently, because BMC ostensibly broke the law (which BMC disputes), BMC does not get the benefit of the preliminary injunction standard.  Yet *every defendant* against whom a plaintiff seeks a mandatory preliminary injunction is alleged to have violated the law.  If alleged rule-breaking excuses a plaintiff from carrying its burden on the third and fourth elements of *Winter*, then mandatory injunctions are subject to a more deferential standard than prohibitory injunctions.  And that, obviously, is not the law—not in the D.C. Circuit, and not anywhere else.

Citing *Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022), the district court found that this Court has "rejected" a "heightened standard for 'mandatory injunctions,' but instead has relied on the traditional four factors as sufficient to evaluate the propriety of injunctive relief."  (Ruling at 4.)  While *Singh* did "decline to

12

reformulate the traditional test set out by the Supreme Court in *Winter*," that is because it found the traditional test to be "sufficiently flexible to take account of all the concerns implicated by the nature of the relief sought" in that case. 56 F.4th at 96. *Singh* does not appear to have decided once and for all that mandatory and prohibitory injunctions are subject to an identical standard. *Compare Democracy Forward Found. v. Office of Mgmt. & Budget*, 780 F. Supp. 3d 61, 72 (D.D.C. 2025) ("Mandatory preliminary injunctions are injunctions that alter, rather than preserve, the *status quo* by commanding some positive act. Judges on this Court have required the moving party to meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." (citations omitted and cleaned up)), *with WhaleCo Inc. v. Shein Tech. LLC*, No. 23-3706 (TJK), 2025 WL 445187, at *4 (D.D.C. Feb. 9, 2025) ("When a plaintiff seeks an injunction that would alter the status quo rather than merely preserve it (*i.e.*, a mandatory injunction), some district courts in this Circuit have applied an even higher standard."). And regardless, neither *Singh* nor any other of this Court's post-*Winter* precedents would allow a district court to gloss over the balance of hardships and the public interest simply because the district court finds persuasive—compelling, even—the plaintiff's arguments about the merits and irreparable harm.

13

The district court understood the risk that Eden will present to the Station House community, including the federal protectees who reside there. The court sensibly did not find that the balance of hardships and the public interest tilt in Eden's favor. But the absence of that finding means that Eden does not qualify for preliminary injunctive relief. The court committed reversible error when it issued an injunction based on Eden's ostensibly satisfying half of the *Winter* elements. A batting average of .500 may be legendary in the MLB, but it does not cut it in federal court after *Winter*.

## II.   BMC will be irreparably injured absent a stay.

Although the district court did not correctly apply the *Winter* test, it did recognize that Eden's "pattern of erratic, threatening, and harassing behavior—including possible criminal conduct—creates some risk for Defendants, their staff, and residents." (Ruling at 8.) The court thought it could mitigate that risk through a series of conduct restrictions in its Order, breach of which could potentially result in the court reevaluating the Order, and it also observed that BMC may eventually be able to evict Eden under D.C. law. (Ruling at 9.)

The problem is that Eden has shown a profound lack of respect for rules and authorities, and has yet to take responsibility for his recent offenses—including at the preliminary injunction hearing, when he pretended not to remember anything about various crimes that allegedly took place this past year, except for his theft

14

(which he only remembered when confronted with a video and then claimed was actually in the U.S. Senators' best interests).  Moreover, while Eden claimed that he currently is taking certain psychiatric medications, he also griped about the medications he was required to take while at Saint Elizabeths.  (9/11/25 Tr. 6, 41)  To whatever extent Eden was beginning to recover while in an institutional setting, the Court can have no confidence that the recovery will continue.

The Court should have no doubt:  the harm resulting from Eden's return to Station House will be immediate, and acute.  Staff are likely to depart.  Indeed, one concierge (the one whom Eden assaulted with condoms) testified:  "I'm at the point where I'm literally asking for a transfer immediately, because I'm not willing to go through any more of the stresses that I've experienced since dealing with Mr. Eden."  (9/11/25 Tr. 114.)  Residents can be expected to leave as well—residents like Erica King, a former tenant who testified that Eden "played a contributing factor into making that place not a home anymore."  (9/11/25 Tr. 141-42.)

Of course, these harms, and the economic harm to BMC in hosting Eden indefinitely in a unit for which he cannot pay, pale in comparison to the harm that will occur if, or more likely when, Eden turns violent again.  Whether Eden directs that violence toward the U.S. Senators who are the subject of his months-long obsession, toward homeless people as he allegedly has done in the recent past, or toward other members of the Station House community, it is only a matter of time

15

before another incident occurs.  BMC should not be required to absorb that risk, particularly where Eden—not BMC—bears the burden at the preliminary injunction stage.  Given these pressing issues, this Court would be well justified to correct the failure of the district court below to apply the correct legal standard before granting extraordinary relief.

### III. Injury to Eden as a result of the stay is debatable but certainly does not outweigh the risk that Eden presents to the Station House community.

Citing *Akassy v. William Penn Apts. LP*, 891 A.2d 291 (D.C. 2006), the district court found that the "D.C. Court of Appeals has largely recognized that the wrongful eviction of a tenant constitutes irreparable harm."  (Ruling at 7.)  Of course, the D.C. Court of Appeals is not the arbiter of what counts as irreparable harm for purposes of a *federal* injunction in *federal* court.  And numerous *federal* cases recognize that an eviction may not give rise to irreparable harm so as to support a TRO or preliminary injunction.  *E.g.*, *Barel v. Fed. Nat'l Mortg. Ass'n*, No. 19-16054 (ES), 2019 WL 13213884, at *3 (D.N.J. Sept. 3, 2019) ("courts in this circuit have rejected the proposition 'that eviction from one's home necessarily constitutes irreparable harm,' because monetary compensation[] is an adequate remedy" (citations omitted)); *Stalker v. PHH Mortg. Corp.*, No. 4:13-cv-0807-DGK, 2013 WL 5306672, at *1 (W.D. Mo. Sept. 20, 2013) ("It appears to the Court that any wrongful eviction could be cured later by an order re-admitting Plaintiff to the property and awarding monetary damages to compensate him for

16

the expense of living elsewhere until he is re-admitted."); *Pimentel v. Deutsche Bank Nat'l Tr. Co.*, No. 09-CV-2264 JLS (NLS), 2009 WL 3398789, at *3 (S.D. Cal. Oct. 20, 2009) ("Regardless of whether foreclosure constitutes an irreparable harm, wrongful eviction from an unowned property can be compensated through monetary relief.").

The district court accepted the false choice presented by Eden's attorney: either Eden returns to a unit at Station House for which he has no funding and does not qualify (to receive, potentially, months or longer of free rent while eviction cases play out in D.C. Superior Court), or he winds up at a shelter or on the streets. These are not, as the district court found, "palatable options" (Ruling at 8), but they also are not the only options. Eden testified that he is seeking a reversal by the housing authority of the termination of his voucher, and if he obtains another voucher or some other funding source, he could use those resources to find a safe living situation where he is less likely to harm himself or innocent third parties. Eden has demonstrated, many times over, that he is not capable of living independently, and certainly not in a community that is the home or place of employment of people he has victimized and stalked. The injury to Eden of a stay pending appeal is debatable, but the injury to BMC and its staff and residents if he is permitted to return to Station House is inevitable.

17

**IV.    The public interest favors protection of innocent third parties and elected federal officials over an immediate housing solution for a dangerous convict.**

For the same reasons set forth in Part II, *supra*, the Court should stay the district court's preliminary injunction Order and protect BMC, its staff, and its residents from Eden's "erratic, threatening, and harassing behavior[,] including possible criminal conduct."  (Ruling at 8.)  The Court not only is allowed to consider the ramifications of the injunction for innocent third parties; it is required to do so.  *Winter* makes that clear enough, where the Supreme Court did "not discount the importance of plaintiffs' ecological, scientific, and recreational interests in marine mammals," but found those interests "plainly outweighed by the Navy's need to conduct realistic training exercises to ensure that it is able to neutralize the threat posed by enemy submarines."  555 U.S. at 33; *see also Friends of the Everglades, Inc. v. Secretary of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *12 (11th Cir. Sept. 4, 2025) ("Given that the federal government has an undisputed and wide-reaching interest in combatting illegal immigration, and that illegal immigration is a matter of national security and public safety, we think the injunction issued below goes against the public interest."); *Cassell v. Snyders*, 990 F.3d 539, 550 (7th Cir. 2021) ("When balancing the public interest—meaning the interests of those not before the court—courts

18

must also keep in mind that plaintiffs are not asking to be allowed to make a self-contained choice to risk only their own health to worship in-person.").

Implicit in the district court's ruling is the concern that, if Eden is likely to prevail on the merits (and the district court certainly concluded that much), he will eventually be entitled to restoration to Unit 943 anyway. *See* Ruling at 8 ("The harm is compounded because Defendants have said they are in the process of re-letting the apartment. If they were to do so . . . and if Mr. Eden ultimately were to prevail, such circumstances would make it exceedingly difficult to reinstate him to the premises."). That logic presupposes that an injunction naturally would follow from a verdict in Eden's favor. Yet the balance of hardships and the public interest matter every bit as much at the end of the case as they do at the preliminary injunction stage. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.").

Perhaps the jury eventually will agree with the district court's preliminary view that BMC wrongfully evicted Eden from Station House. Or perhaps not. But if the jury agrees with Eden, the appropriate remedy for any such wrongful

19

eviction, as in legions of cases involving wrongful eviction, or wrongful

termination, or breach of contract, or conversion, or due process violations, or any

number of harms in which some proprietary or property interest has been deprived,

is money damages.  An injunction reinstating a dangerous criminal to the

community he has harassed is not appropriate now, and it never will be.

### <u>Conclusion</u>

The Court should stay the district court's preliminary injunction Order and

enter an expedited briefing schedule for this appeal.

Respectfully submitted,

**GALLAGHER LLP**

_____/s/ Joe Dugan_____
James D. Bragdon (Bar No. 61044)
jbragdon@gejlaw.com
Joe Dugan (Bar No. 66451)
jdugan@gejlaw.com
218 North Charles Street, Suite 400
Baltimore, MD  21201
Telephone: (410) 727-7702
Fax: (410) 468-2786
*Attorneys for Defendants-Appellants*

Date:  September 15, 2025

## CERTIFICATE OF COMPLIANCE

1.     This motion contains 5,170 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(a)(2)(B).  This motion therefore complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A).

2.     This motion has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.  This motion therefore complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as those rules are made applicable to motions through Fed. R. App. P. 27(d)(1)(E).

*/s/ Joe Dugan*
Joe Dugan

## CERTIFICATE OF PARTIES

The following parties appeared before the district court and will be parties in this Court:  Plaintiff Artemus Eden; Defendant Station Townhouses LLC; and Defendant Bozzuto Management Company.  No other parties, intervenors, or amici have appeared.

*/s/ Joe Dugan*
Joe Dugan

21

## **DISCLOSURE STATEMENT**

Bozzuto Management Company is a nongovernmental corporation formed under the laws of Maryland and wholly owned by Bozzuto & Associates, Inc.  No publicly held corporation owns 10% or more of its stock.  Bozzuto Management Company is the property manager for Station House, the multifamily residential community at issue in this appeal.

Station Townhouses LLC is a limited liability company organized under the laws of Delaware and wholly owned by Capitol Place Mezz LLC, a Delaware limited liability company.  No publicly held corporation holds any interest in Station Townhouses LLC.  Station Townhouses LLC owns Station House, the multifamily residential community at issue in this appeal.

*/s/ Joe Dugan*

Joe Dugan

## **CERTIFICATE OF SERVICE**

I CERTIFY that on September 15, 2025, the foregoing Emergency Motion, together with the exhibits and proposed order thereto, was served by email on the following counsel for Plaintiff-Appellee:

Neil Satterlund, Esq.
Neighborhood Legal Services Program
64 New York Ave., NE
Washington, DC  20002
nsatterlund@nlsp.org

*/s/ Joe Dugan*

Joe Dugan

22