No. 25-7133

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

**ARTEMUS EDEN,**

*Plaintiff-Appellee,*

v.

**STATION TOWNHOUSES LLC, ET AL.,**

*Defendants-Appellants.*

————————————

Appeal from the United States District Court
for the District of Columbia,
No. 1:25-cv-02944-APM
(The Honorable Amit P. Mehta)

————————————

## OPENING BRIEF OF APPELLANTS STATION TOWNHOUSES LLC AND BOZZUTO MANAGEMENT COMPANY

————————————

James D. Bragdon
Joe Dugan
GALLAGHER LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
jbragdon@gejlaw.com
jdugan@gejlaw.com
(410) 727-7702

*Counsel for Defendants-Appellants Station Townhouses LLC and Bozzuto Management Company*

954589

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

1.     The following parties appeared before the district court and are parties in this Court:  Plaintiff Artemus Eden; Defendant Station Townhouses LLC; and Defendant Bozzuto Management Company.  No other parties, intervenors, or amici have appeared.

2.     Circuit Rule 26.1 disclosure:  Bozzuto Management Company is a nongovernmental corporation formed under the laws of Maryland and wholly owned by Bozzuto & Associates, Inc.  No publicly held corporation owns 10% or more of its stock.  Bozzuto Management Company is the property manager for Station House Apartments, the multifamily residential community at issue in this appeal.

Station Townhouses LLC is a limited liability company organized under the laws of Delaware and wholly owned by Capitol Place Mezz LLC, a Delaware limited liability company.  No publicly held corporation holds any interest in Station Townhouses LLC.  Station Townhouses LLC owns Station House Apartments, the multifamily residential community at issue in this appeal.

### B.     Rulings Under Review

Bozzuto appeals from the September 12, 2025 Order of District Judge Amit P. Mehta granting Plaintiff Artemus Eden's motion for a preliminary injunction.  JA0015-0028; *Eden v. Station Townhouses LLC*, No. 24-cv-02944 (APM), 2025 WL 2646934 (D.D.C. Sept. 12, 2025).

### C.     Related Cases

This case was previously before the D.C. Superior Court.  Defendants Station Townhouses LLC and Bozzuto Management Company removed the case to federal court (*Eden v. Station Townhouses LLC,*

954589

*et al.*, No. 2025-CAB-005811).  Defendants are aware of no pending related cases.

954589

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ................................ i

Table of Authorities ................................................................................... v

Glossary.................................................................................................... vii

Jurisdictional Statement ............................................................................ 1

Statement of the Issues.............................................................................. 2

Statement of the Case................................................................................ 2

Summary of the Argument........................................................................ 8

Argument.................................................................................................. 11

    I.    Under *Winter*, a movant must establish not only likelihood of success on the merits and likelihood of irreparable harm, but also that the balance of equities tips in his favor and that an injunction is in the public interest. ...................................................... 11

    II.    Where each *Winter* element weighs against injunctive relief or is at most debatable, the district court erred in nevertheless granting Eden's request for a mandatory preliminary injunction. ...... 18

        A.    The balance of equities and the public interest weigh heavily against mandatory preliminary injunctive relief in this case....18

        B.    Eden did not establish that he was "likely" to suffer irreparable harm absent reinstatement to an apartment that lacks the institutional supports he requires and for which he has no means to pay rent. ...................................................................24

        C.    A reasonable jury could adopt Station House's abandonment defense, and that finding would extinguish Eden's wrongful eviction claim...........................................................................26

Conclusion ............................................................................................... 33

Request for Oral Argument...................................................................... 34

Certificate of Compliance—Fed. R. App. P. 32(G)(1).......................... 35

iii

954589

Statutory Addendum ........................................................................... Add. i

954589

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barel v. Fed. Nat'l Mortg. Ass'n*,
  No. 19-16054 (ES), 2019 WL 13213884 (D.N.J. Sept. 3, 2019) .......................24

*Benisek v. Lamone*,
  585 U.S. 155 (2018)....................................................................14

*Cassell v. Snyders*,
  990 F.3d 539 (7th Cir. 2021) ...............................................................22

*Clevinger v. Advocacy Holdings, Inc.*,
  134 F.4th 1230 (D.C. Cir. 2025)..........................................11, 13, 18

*Colón-Díaz v. United States*,
  899 F. Supp. 2d 119 (D.P.R. Sept. 20, 2012) .....................................31

*Democracy Forward Found. v. Office of Mgmt. & Budget*,
  780 F. Supp. 3d 61 (D.D.C. 2025)...................................................17

*Diné Citizens Against Ruining Our Env't v. Jewell*,
  839 F.3d 1276 (10th Cir. 2016) ........................................................13

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)....................................................................23

*Friends of the Everglades, Inc. v. Secretary of U.S. Dep't of
  Homeland Sec.*,
  No. 25-12873, 2025 WL 2598567 (11th Cir. Sept. 4, 2025).............................22

*Holmes v. District of Columbia*,
  267 A.3d 1028 (D.C. 2022) .................................................11, 27, 32

*Int'l Comm'n on English in the Liturgy v. Schwartz*,
  573 A.2d 1303 (D.C. 1990) ...............................................................26

*Pimentel v. Deutsche Bank Nat'l Tr. Co.*,
  No. 09-CV-2264 JLS (NLS), 2009 WL 3398789 (S.D. Cal. Oct.
  20, 2009) ...................................................................................24

954589

*Real Truth About Obama, Inc. v. FEC*,
   575 F.3d 342 (4th Cir. 2009) ...............................................................13

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011)..............................................................14

*Simpson v. Lee*,
   499 A.2d 889 (D.C. 1985) ....................................................................27

*Singh v. Berger*,
   56 F.4th 88 (D.C. Cir. 2022).................................................................16

*Stalker v. PHH Mortg. Corp.*,
   No. 4:13-cv-0807-DGK, 2013 WL 5306672 (W.D. Mo. Sept. 20,
   2013) .....................................................................................................24

*State v. Brauch*,
   984 P.2d 703 (Idaho 1999) ...................................................................31

*United States v. Manning*,
   841 F. App'x 242 (D.C. Cir. 2021)........................................................20

*WhaleCo Inc. v. Shein Tech. LLC*,
   No. 23-3706 (TJK), 2025 WL 445187 (D.D.C. Feb. 9, 2025)............17

*Winter v. Natural Resources Defense Council*,
   555 U.S. 7 (2008).........................................................................8, 12, 22

*Wreal, LLC v. Amazon.com, Inc.*,
   840 F.3d 1244 (11th Cir. 2016) ............................................................13

**Statutes**

28 U.S.C. § 1292 ...........................................................................................1

28 U.S.C. § 1332 ...........................................................................................1

vi

## GLOSSARY

| | |
|---|---|
| BMC | Defendant-Appellant Bozzuto Management Company |
| DCHA | D.C. Housing Authority |
| Eden | Plaintiff-Appellee Artemus Eden |
| Station House | The brief refers to Defendants-Appellants Bozzuto Management Company and Station Townhouses LLC together as "Station House" |
| Station Townhouses | Defendant-Appellant Station Townhouses LLC |

954589

# JURISDICTIONAL STATEMENT

Eden initially filed his Complaint in the D.C. Superior Court (Case No. 2025-CAB-005811) on August 29, 2025.  Defendants removed to the U.S. District Court for the District of Columbia on September 1, 2025.  The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as the amount in controversy exceeds $75,000, and as Eden and Defendants are citizens of different states.[1] Eden is a citizen of the District of Columbia; BMC is incorporated and has its principal place of business in Maryland; Station Townhouses is organized under the laws of Delaware, with its principal place of business in New York; and the entities that own Station Townhouses likewise are located outside the District of Columbia.

This Court has jurisdiction over the interlocutory ruling of the district court granting Eden's motion for a preliminary injunction pursuant to 28 U.S.C. § 1292(a)(1).  The district court entered the preliminary injunction on September 12, 2025.  Station House noted its appeal that same day.  JA0029.

---

[1]  Statutory citations are reproduced in an addendum hereto, per Circuit Rule 28(a)(5).

954589

## STATEMENT OF THE ISSUES

1.    Did the district court err in issuing a mandatory preliminary injunction without first finding that Eden prevailed on each of the four elements set forth in *Winter v. Natural Resources Defense Council*?

2.    Did the district court err in issuing a mandatory preliminary injunction where the public interest and the balance of equities weigh against injunctive relief, the risk of irreparable harm is debatable, and Station House presented evidence from which a reasonable jury could reject Eden's theory of wrongful eviction?

## STATEMENT OF THE CASE

### *Eden's Troubled Tenancy*

Station House Apartments, located in the heart of D.C.'s Atlas District, provide sanctuary and a vibrant living space for a diverse resident population of families, young professionals, and government employees.  JA0154.  The property counts among its tenants several United States Senators.  JA0098.

Eden resided at Station House Apartments from 2020 until his arrest for alleged sexual assault of a homeless woman in 2025.  JA0015; JA0135.  As the district court found at the preliminary injunction hearing, Eden engaged in a "pattern of erratic, threatening, and harassing behavior."  JA0022.  Uncontroverted testimony at the hearing established that Eden would sexually harass the property manager, lifting his shirt to "show off his weight loss" and making flirtatious

2

comments such as, "where's my ring at?" JA0158. He would yell at the manager, getting so close to her face that a resident in a wheelchair would intervene by positioning herself between the two of them. JA0158-0159. Eden also harassed a property concierge, including by assaulting her with condoms and threatening that he would use the condoms to "f*ck Bozzuto." JA0142. A video depicting the condom-flinging incident, which was admitted into evidence at the hearing as Exhibit 27, is available at http://tinyurl.com/edenassault. Eden sexually harassed the concierge, calling her a "stallion" and an "African goddess." JA0145. The concierge testified that these statements made her feel "[h]orrible," and that she "begged [Eden] many times to please not say that to me, do not flirt with me, do not talk to me like that," but the behavior continued. JA0145.

Eden did not confine his harassment to Station House staff. He also stalked one or more United States Senators who reside at the property. Eden claimed to be "chummy" with one Senator and admitted that he "started leaving stuff at his door. And it made staff uncomfortable." JA0180. In early 2025, Eden posted a disturbing and defamatory flyer on the Senator's door. JA0070; JA0335. Special Agent Jesse Cole with the United States Capitol Police testified that his agency conducted a threat assessment with respect to Eden and found a threat to exist. JA0084. Agent Cole elaborated that the risk arose from Eden's (i) irrational fear of foreign intelligence services infiltrating BMC in a manner that would breach the

3

safety of the Senators' apartments; (ii) "intensity of effort," including by communicating with the Senators through multiple modalities; (iii) lack of boundaries; and (iv) target focus, which was "high." JA0086-0087. Indeed, just one day before the preliminary injunction hearing—but after Eden was on notice that the district court would be evaluating the risk he presented to the community—Eden assaulted a Senate staffer by poking her in the chest. JA0087.

### *Eden's Crimes*

During the same period in which Eden harassed Station House Apartments personnel and stalked elected officials, his conduct toward others escalated to violent crimes and threats. On March 28, 2025, Eden was arrested for an alleged sexual assault committed inside his apartment. JA0015. Detective James Payne with the D.C. Metropolitan Police Department testified that the victim, a homeless woman, described Eden as having assaulted her by placing an item inside her vagina. JA0131-0132, JA0135. According to Detective Payne, when he arrived on the scene, Eden "made a singular statement about it being he say/she say." JA0132. Detective Payne further testified that, according to Eden, he had "engaged in masturbation" while watching his victim. JA0135.

Although the sexual assault charge was eventually nolle prossed for reasons not in the record, other criminal charges against Eden in early 2025 stuck. In Case No. 2025 CMD 003196, Eden was charged in the D.C. Superior Court with

4

unlawful entry on private property after making a threat to the chief of the Metropolitan Police Department and subsequently attempting to gain access to a police facility despite being barred from entry. Detective Martin Dominguez with the Metropolitan Police Department testified that Eden had phoned the internal affairs division to report that "he was a threat to the chief," that this was "not a complaint, that it was a threat, and that he was on his way." JA0122. In Case No. 2025 CMD 003197, Eden was charged in the D.C. Superior Court with theft after he stole paperwork containing sensitive information about Station House residents from the concierge desk. A video capturing the theft, which was admitted into evidence as Exhibit 26, is available at https://tinyurl.com/edentheft.

Importantly, the testimony about Eden's criminal acts and threats to others was not contested—not even by Eden himself. When undersigned counsel questioned Eden about his crimes, Eden claimed not to recall being charged with sexual assault, or being charged with trespass on police property, or earlier incidents in which he had been charged with assaulting a woman on North Capitol Street (Case No. 2024 CMD 007377) and with assaulting and threatening an out-of-town visitor (Case No. 2025 CMD 003414). JA0060-JA0065. Eden initially claimed not to recall his theft crime either, JA0065, though after being confronted with the video—which depicts him stealing sensitive Station House Apartments records—Eden changed his tune and asserted that, really, he was just

954589

looking out for the United States Senators whose residential information may have been included among the records he stole.  JA0067-0068.

### *The Abandonment*

Following Eden's arrest for sexual assault of a homeless woman, he was found incompetent to stand trial and committed to Saint Elizabeths Hospital until mid-August 2025.  JA0015.  He ultimately pled guilty to the theft offense as part of a plea deal that also resolved the police stalking offense.  *See* JA0015.

In May 2025, after Eden had been away for many weeks, Station House discovered a cockroach infestation that had spread from Eden's unit into the rest of the building.  JA0162.  Station House personnel entered the unit and discovered it in "complete disarray:  cockroaches, dishes in the sink, no furniture except a bed, empty food containers, and no food in the refrigerator."  JA0016.  The property manager testified that the conditions of the unit were so deplorable that she was forced to don a hazmat suit before entering.  JA0161.  Two months later, Station House learned that Eden's housing voucher had been terminated by the DCHA and that Eden had not timely appealed the termination.  JA0016.

Based on the totality of the circumstances, including Eden's long and undefined absence, the uninhabitable state of the apartment, and the termination of Eden's voucher, Station House deemed the unit abandoned and retook possession in late July.  JA0167-0168.

6

### *Procedural History*

Following his plea deal in late August, Eden returned to Station House Apartments, discovered that his former unit had been turned over, and sued Station House for wrongful eviction in D.C. Superior Court.  Station House removed on the basis of diversity, and Eden thereafter moved for a mandatory preliminary injunction requiring Station House to place him back in his former apartment while the litigation plays out.

The district court held an evidentiary hearing on September 11, 2025, and ruled the next day that Eden was entitled to a preliminary injunction because, in the district court's view, Eden had established a likelihood of success on the merits and a risk of irreparable harm absent injunctive relief.  The district court did not find that either the balance of hardships or the public interest favored Eden's position, but instead held that the hardships Station House would suffer—including "loss of rents, and that its staff and residents would once more be exposed to [Eden's] erratic and harassing behavior," do "not outweigh Mr. Eden's success on the first two most important factors."  JA0024.  In an attempt to address those third-party interests, the district court included certain conduct restrictions in its Order, including that Eden is prohibited from orally communicating with Station House personnel except in case of an emergency, that Eden generally is prohibited from accessing amenity spaces at Station House Apartments, and that Eden is

7

prohibited from contacting elected United States officials who reside at Station House Apartments.  JA0026-0027.[2]

Station House moved the district court to stay its Order pending Station House's appeal.  The district court denied that motion and entered its preliminary injunction Order on September 12, 2025.  JA0251; JA0027-0028.  Station House noted an appeal that same day.  JA0029.  Station House then moved for an emergency stay in this Court, which the Court denied while simultaneously accelerating the appeal briefing schedule.

## SUMMARY OF THE ARGUMENT

The Court should vacate the preliminary injunction.  As a threshold legal matter, the district court erred because it did not find that Eden prevailed on *each* of the four elements under *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).  Rather, the district court found that "Defendants wrongfully evicted Plaintiff from his tenancy . . . and Plaintiff will suffer irreparable harm if not granted injunctive relief.  Neither the balance of harms nor the public interest, individually or together, outweigh Plaintiff's success on the first two injunction factors."  JA0026.  Under *Winter*, however, a district court must find that the

---

[2]  Eden almost immediately violated the conduct restrictions, and the district court held a show cause hearing on September 24, 2025, after this appeal was docketed. The district court did not take action at that hearing but warned Eden about his obligation to comply.

954589

preliminary injunction movant prevails as to *each* element—likelihood of success on the merits, the risk of irreparable harm, the balance of equities, and the public interest.  It is not sufficient for a district court to find, as the court did here, that the movant has made a sufficient (or even strong) showing as to the likelihood of success and the risk of irreparable harm, and that harm to the non-movant and third parties can be mitigated somewhat by conditions in the court's order.  If the balance of equities does not tip in the movant's favor, and/or if the public interest does not warrant a preliminary injunction, then an injunction is not appropriate. The Court should use this appeal to clarify the *Winter* standard and to confirm that the old sliding-scale approach (which the district court effectively applied, though the court asserted that it would consider each *Winter* element) is not good law in this Circuit.

The district court also erred because the evidentiary record would not support a finding that the balance of equities or the public interest favor preliminary injunctive relief.  Rather, unrebutted evidence in the record establishes, as the district court recognized, that Eden's "pattern of erratic, threatening, and harassing behavior—including possible criminal conduct—creates some risk for Defendants, their staff, and residents."  JA0022.  Indeed, the record shows that from the middle of 2024 through early 2025, Eden posed a threat to elected officials who reside at Station House Apartments; sexually harassed property staff,

954589

including by assaulting a concierge with condoms; stole sensitive Station House property; and was alleged to have sexually assaulted a homeless woman, together with other offenses. The district court did not find that the balance of equities and the public interest favor an order restoring Eden to his former unit, because the court could not have made such a finding on the facts here—particularly where the only evidence supporting Eden's position was his own meandering, incoherent testimony.

Nor did Eden carry his burden on the remaining factors. While the district court was concerned that Eden might wind up on the streets but for his requested reinstatement, Station House Apartments is not the only housing solution in the District, nor is it an appropriate solution for Eden. Eden requires institutional supports such as those he received at Saint Elizabeths Hospital, and Station House Apartments is not set up to provide those supports. If Eden obtains a new housing voucher or some other funding source to pay for rent, he can use those funds to secure housing in an environment that meets his needs. For that reason, and because money damages could be available in the event the jury returns a verdict in Eden's favor, Eden has not established a risk of irreparable harm.

Finally, while the district court was persuaded, on the record before it, that Eden likely will prevail on the merits of his wrongful eviction claim, the court reached that determination principally because Eden's attorney continued to fight

954589

pending eviction cases while he was committed at Saint Elizabeths, and Station House did not discuss with that attorney its determination that Eden had abandoned his unit. But for purposes of wrongful eviction, the relevant question is whether the landlord "performed 'some act of a permanent character with the *intention* and effect of depriving the tenant of the enjoyment of the . . . premises . . . .'" *Holmes v. District of Columbia*, 267 A.3d 1028, 1032 (D.C. 2022) (emphasis added) (alteration in original) (citations omitted). Ample evidence provided a basis for Station House to determine in July 2025 that Eden had abandoned his unit—from his months-long absence without any outreach to the property, to the ambiguous statements of his counsel, to the deplorable conditions in the unit, to the termination of his voucher. The totality of the circumstances pointed to abandonment, and as such, Station House did not act with the intention to deprive Eden of any rights of tenancy.

## ARGUMENT

**I.    Under *Winter*, a movant must establish not only likelihood of success on the merits and likelihood of irreparable harm, but also that the balance of equities tips in his favor and that an injunction is in the public interest.**

The Court reviews de novo the district court's legal conclusions in connection with its preliminary injunction ruling. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233 (D.C. Cir. 2025).

11

The district court made two related, procedural errors in its preliminary injunction ruling.  First, the court entered a preliminary injunction without finding that the balance of equities and the public interest favored immediate relief for Eden.  Quite the contrary, the court recognized that "Mr. Eden's pattern of erratic, threatening, and harassing behavior—including possible criminal conduct—creates some risk for Defendants, their staff, and residents."  JA0022.  Yet the court found that Eden's success on the first two elements of the preliminary injunction framework set forth in *Winter* outweighed Station House's showing as to the latter two elements.  JA0024.  In its preliminary injunction Order, the court clarified: "Neither the balance of harms nor the public interest, individually or together, outweigh Plaintiff's success on the first two injunction factors." JA0026.

The law is settled, though, that a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  No matter how strong a showing a plaintiff makes on any one element of the test, the plaintiff must prevail on *each* element.  This heavy burden is appropriate, because a preliminary injunction is "an extraordinary remedy never awarded as of right."  *Id.* at 24.

12

The district court remarked that it "remains an open question whether the sliding-scale approach that the D.C. Circuit adopted long ago still applies." JA0018.  That may technically be correct, although as this Court recently observed, it is "questionable that the sliding scale approach remains good law after 2008, when the Supreme Court decided *Winter* . . . .  That opinion can be read to require movants to establish *each* preliminary injunction factor independently."  *Clevinger*, 134 F.4th at 1235; *see also id.* at 1235-36 (marveling that "we have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said," and acknowledging that "[o]ne day, we will need to answer that question"); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016) ("A preliminary injunction is an 'extraordinary and drastic remedy,'  and Wreal bears the 'burden of persuasion' to clearly establish all four of these prerequisites." (citations omitted)); *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1282 (10th Cir. 2016) ("Under *Winter*'s rationale, any modified test which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."); *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009) ("*Winter* articulates four requirements, each of which must be satisfied as articulated . . . ."), *vacated on other grounds*, 559 U.S. 1089 (2010), *reinstated in relevant part*, 607 F.3d 355 (4th Cir. 2010) (mem.).

954589

For that matter, the district court's reasoning could not even withstand the classic formulation of the sliding-scale approach, which "allowed that a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The district court did not hold that Eden made a strong showing on the first two elements and a weaker showing on the second two. The court held that Eden made a strong showing on the first two elements that swallowed up the other two. That approach cannot be squared with *Winter*, particularly because it downplays the potential (and potentially catastrophic) impact of preliminary injunctive relief on innocent third parties. *See Benisek v. Lamone*, 585 U.S. 155, 158 (2018) ("Even if we assume—contrary to the findings of the District Court—that plaintiffs were likely to succeed on the merits of their claims, the balance of equities and the public interest tilted against their request for a preliminary injunction.").

The district court's Order finding on two of four *Winter* elements wasn't grammatical slippage. The district court apparently concluded that a movant can carry his burden to win a preliminary injunction without independently satisfying each of the four *Winter* elements. During closing argument, undersigned counsel had the following exchange with the district court:

> THE COURT: So say he prevails on the first two, you think I shouldn't then enter an injunction?
> MR. DUGAN: Absolutely.
> THE COURT: Really?

14

MR. DUGAN:  Every factor.

THE COURT:  Even though substantial likelihood of success, irreparably harmed if I don't issue it, just because of what harm that you're concerned about and the public interests means that he has to remain homeless until this case get resolved.

MR. DUGAN:  Well, I don't—we don't credit that sort of zero-sum game.

JA0210.

The problem with the district court's approach, apart from its tension with *Winter*, is that preliminary injunctions (particularly mandatory preliminary injunctions) can have profound, adverse consequences for nonmovants and third parties.  Imagine, for instance, a blighted building that presents an extreme public safety risk to a neighborhood down on its luck.  Imagine that an out-of-state owner of the building persuades a federal court that some procedural error rendered a condemnation order defective and that the owner, despite not residing in the property, would be in some sense "irreparably harmed" if the building were torn down.  Could a federal court stop there and enter an injunction prohibiting demolition?  Of course not.  The court necessarily would proceed to consider the ramifications to the surrounding community if demolition were delayed by months or years while litigation played out.

The same logic applies here.  Actually, it applies with greater force, and here lies the district court's second procedural error:  while the court paid lip service to the idea that mandatory preliminary injunctions require "greater wariness" than

15

those that would preserve the status quo, JA0019, the court's opinion does not manifest any application of that principle. Rather, the court scolded Station House for trying to "secure the relief they seek through equitable considerations instead of the statutorily mandated process" for eviction. JA0023. Put differently, because Station House ostensibly broke the law—which Station House disputes—Station House does not get the benefit of the preliminary injunction standard. Yet ***every defendant*** against whom a plaintiff seeks a mandatory preliminary injunction is alleged to have violated the law. Otherwise, there would be no status quo for the court to disrupt with mandatory preliminary relief. If a defendant's alleged rule-breaking excuses a plaintiff from carrying its burden on the third and fourth elements of *Winter*, then mandatory injunctions are subject to a more deferential standard than prohibitory injunctions. And that, obviously, is not the law—not in the D.C. Circuit, and not anywhere else.

Citing *Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022), the district court found that this Court has "rejected" a "heightened standard for 'mandatory injunctions,' but instead has relied on the traditional four factors as sufficient to evaluate the propriety of injunctive relief." JA0018. While *Singh* did "decline to reformulate the traditional test set out by the Supreme Court in *Winter*," that is because it found the traditional test to be "sufficiently flexible to take account of all the concerns implicated by the nature of the relief sought" in that case. 56 F.4th at 96. *Singh*

16

does not appear to have decided once and for all that mandatory and prohibitory injunctions are subject to an identical standard. *Compare Democracy Forward Found. v. Office of Mgmt. & Budget*, 780 F. Supp. 3d 61, 72 (D.D.C. 2025) ("Mandatory preliminary injunctions are injunctions that alter, rather than preserve, the *status quo* by commanding some positive act. Judges on this Court have required the moving party to meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction." (citations omitted and cleaned up)), *with WhaleCo Inc. v. Shein Tech. LLC*, No. 23-3706 (TJK), 2025 WL 445187, at *4 (D.D.C. Feb. 9, 2025) ("When a plaintiff seeks an injunction that would alter the status quo rather than merely preserve it (*i.e.*, a mandatory injunction), some district courts in this Circuit have applied an even higher standard."). And regardless, neither *Singh* nor any other of this Court's post-*Winter* precedents would allow a district court to downplay the balance of hardships and the public interest simply because the district court finds persuasive—compelling, even—the plaintiff's arguments about the merits and irreparable harm.

The district court here recognized the risk that Eden will present to the Station House community, including the federal protectees who reside there. The court sensibly did not find that the balance of hardships and the public interest tilt

954589

in Eden's favor. But the absence of that finding means that Eden does not qualify for preliminary injunctive relief. The court committed reversible error when it issued an injunction based on Eden's ostensibly satisfying half of the *Winter* elements. A batting average of .500 may be legendary in the MLB, but it cannot carry the day in federal court after *Winter*. And because of the district court's interrelated procedural errors—its failure to find in Eden's favor on each of the four *Winter* elements, and its failure to accord Eden's request for mandatory injunctive relief the scrutiny that request warrants—the Court should vacate the preliminary injunction regardless of how the Court otherwise views the evidence.

**II.    Where each *Winter* element weighs against injunctive relief or is at most debatable, the district court erred in nevertheless granting Eden's request for a mandatory preliminary injunction.**

The Court reviews the "district court's legal conclusions de novo—including its legal conclusion about the likelihood of irreparable harm." *Clevinger*, 134 F.4th at 1233. The court reviews "any weighing of the preliminary injunction factors for abuse of discretion," and "accept[s] a district court's factual findings unless they are clearly erroneous." *Id.* at 1233-34.

**A.    The balance of equities and the public interest weigh heavily against mandatory preliminary injunctive relief in this case.**

Although the district court did not correctly apply the *Winter* test, it did recognize that Eden's "pattern of erratic, threatening, and harassing behavior— including possible criminal conduct—creates some risk for Defendants, their staff,

and residents." JA0022.  That is putting it mildly.  In the months leading up to his

arrest and involuntary commitment to Saint Elizabeths earlier this year, Eden,

among other misdeeds and alleged criminal offenses:

- Sexually harassed Station House personnel, JA0145, JA0158, and assaulted a concierge with condoms, JA0142;

- Stalked one or more United States Senators who reside at the property, JA0070, JA0180, to the extent that United States Capitol Police conducted a threat assessment and found a threat to exist, JA0084;

- Allegedly committed a sexual assault against a homeless woman in his apartment unit, JA0131-0132;

- Allegedly trespassed on police property after threatening the chief of the Metropolitan Police Department, JA0122; and

- Stole paperwork containing sensitive information about Station House residents from the concierge desk, JA0067-0068.

Eden is unstable and violent.[3]  The Court can take judicial notice of public

records on the docket of D.C. Superior Court Case No. 2025 CMD 003197 (the

docket associated with Eden's theft offense) showing that (i) Eden was committed

to Saint Elizabeths on April 23, 2025; (ii) a May 27, 2025 report from the

Department of Behavioral Health found Eden "presented as alternately paranoid

and grandiose, with bizarre and disorganized thinking, and with grandiose,

---

[3]  While Eden was not convicted of some of the offenses for which he was charged, he did not dispute that he committed these crimes—rather, he claimed not to remember.  JA0060-JA0065.

paranoid, and bizarre delusional thinking" (page 4); and (iii) an August 6, 2025 report from the Department of Behavioral Health found Eden "**tenuously competent**" only (page 7).[4]

While acknowledging the risk that Eden presents, including to third parties who have nothing to do with this litigation and have done nothing to invite harassment by Eden, the district court thought it could mitigate that risk through a series of conduct restrictions in its Order. JA0023. The court also observed that Station House may eventually be able to evict Eden under D.C. law. JA0023.

The problem is that Eden has shown a profound lack of respect for rules and authorities, and has yet to take responsibility for his recent offenses—including at the preliminary injunction hearing, when he pretended not to remember anything about various crimes that allegedly took place this past year, except for his theft (which he only remembered when confronted with a video and then claimed was actually in the United States Senators' best interests). JA0067-0068. Moreover, while Eden claimed that he currently is taking certain psychiatric medications, he also griped about the medications he was required to take while at Saint Elizabeths. JA0039. To whatever extent Eden was beginning to recover while in an

---

[4] *See United States v. Manning*, 841 F. App'x 242, 243 (D.C. Cir. 2021) (per curiam) ("As an initial matter, we grant the government's pending motion to take judicial notice of three documents in the docket of a related District of Maryland proceeding.").

954589

institutional setting, the Court can have no confidence that the recovery will continue.

The Court should have no doubt:  the harm resulting from Eden's return to Station House Apartments will be immediate, and acute.  Staff are likely to depart. Indeed, one concierge (the one whom Eden assaulted with condoms) testified: "I'm at the point where I'm literally asking for a transfer immediately, because I'm not willing to go through any more of the stresses that I've experienced since dealing with Mr. Eden."  JA0149.  Residents can be expected to leave as well— residents like Erica King, a former tenant who testified that Eden "played a contributing factor into making that place not a home anymore."  JA0177.

Of course, these harms, and the economic harm to Station House in hosting Eden indefinitely in a unit for which he cannot pay (assuming his voucher is not reinstated, and the status quo is that he does not have a voucher and has not had funding for months), pale in comparison to the harm that will occur if, or more likely when, Eden turns violent again.  Whether Eden directs that violence toward elected officials who are the subject of his months-long obsession, toward homeless people as he allegedly has done in the recent past, or toward other members of the Station House community, it is only a matter of time before another incident occurs.

The Court not only is permitted to consider the ramifications of the injunction for innocent third parties; it is required to do so. *Winter* makes that clear enough, where the Supreme Court did "not discount the importance of plaintiffs' ecological, scientific, and recreational interests in marine mammals," but found those interests "plainly outweighed by the Navy's need to conduct realistic training exercises to ensure that it is able to neutralize the threat posed by enemy submarines." 555 U.S. at 33; *see also Friends of the Everglades, Inc. v. Secretary of U.S. Dep't of Homeland Sec.*, No. 25-12873, 2025 WL 2598567, at *12 (11th Cir. Sept. 4, 2025) ("Given that the federal government has an undisputed and wide-reaching interest in combatting illegal immigration, and that illegal immigration is a matter of national security and public safety, we think the injunction issued below goes against the public interest."); *Cassell v. Snyders*, 990 F.3d 539, 550 (7th Cir. 2021) ("When balancing the public interest—meaning the interests of those not before the court—courts must also keep in mind that plaintiffs are not asking to be allowed to make a self-contained choice to risk only their own health to worship in-person.").

Implicit in the district court's preliminary injunction ruling is the concern that, if Eden is likely to prevail on the merits (as the district court presumed that he will), Eden eventually will be entitled to restoration to his former apartment unit anyway. The court wrote: "The harm is compounded because Defendants have

22

said they are in the process of re-letting the apartment.  If they were to do so . . .

and if Mr. Eden ultimately were to prevail, such circumstances would make it

exceedingly difficult to reinstate him to the premises."  JA0022.  Yet the balance

of hardships and the public interest matter every bit as much at the end of the case

as they do at the preliminary injunction stage.  *See eBay Inc. v. MercExchange,*

*L.L.C.*, 547 U.S. 388, 391 (2006) ("A plaintiff must demonstrate: (1) that it has

suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the

balance of hardships between the plaintiff and defendant, a remedy in equity is

warranted; and (4) that the public interest would not be disserved by a permanent

injunction.").

Perhaps the jury eventually will agree with the district court's preliminary

view that Eden was wrongfully evicted.  Or perhaps not.  But if the jury agrees

with Eden, the appropriate remedy for any such wrongful eviction, as in legions of

cases involving wrongful eviction, or wrongful termination, or breach of contract,

or conversion, or due process violations, or any number of harms in which some

proprietary or property interest has been deprived, is money damages.  An

injunction reinstating a dangerous criminal to the community he has harassed is not

appropriate now, and it never will be.

23

Because Eden cannot carry his burden, at least as to the balance of equities and the public interest elements of the *Winter* test, the Court should vacate the district court's preliminary injunction Order.

**B.     Eden did not establish that he was "likely" to suffer irreparable harm absent reinstatement to an apartment that lacks the institutional supports he requires and for which he has no means to pay rent.**

Citing *Akassy v. William Penn Apts. LP*, 891 A.2d 291 (D.C. 2006), the district court found that the "D.C. Court of Appeals has largely recognized that the wrongful eviction of a tenant constitutes irreparable harm." JA0021. Of course, the D.C. Court of Appeals is not the arbiter of what counts as irreparable harm for purposes of a *federal* injunction in *federal* court. And numerous *federal* cases recognize that an eviction may not give rise to irreparable harm so as to support a TRO or preliminary injunction. *E.g.*, *Barel v. Fed. Nat'l Mortg. Ass'n*, No. 19-16054 (ES), 2019 WL 13213884, at *3 (D.N.J. Sept. 3, 2019) ("courts in this circuit have rejected the proposition 'that eviction from one's home necessarily constitutes irreparable harm,' because monetary compensation[] is an adequate remedy" (citations omitted)); *Stalker v. PHH Mortg. Corp.*, No. 4:13-cv-0807-DGK, 2013 WL 5306672, at *1 (W.D. Mo. Sept. 20, 2013) ("It appears to the Court that any wrongful eviction could be cured later by an order re-admitting Plaintiff to the property and awarding monetary damages to compensate him for the expense of living elsewhere until he is re-admitted."); *Pimentel v. Deutsche*

24

*Bank Nat'l Tr. Co.*, No. 09-CV-2264 JLS (NLS), 2009 WL 3398789, at *3 (S.D. Cal. Oct. 20, 2009) ("Regardless of whether foreclosure constitutes an irreparable harm, wrongful eviction from an unowned property can be compensated through monetary relief.").

The district court credited the false choice presented by Eden's attorney: either Eden returns to a unit at Station House Apartments for which he has no funding and does not qualify (to receive, potentially, months or longer of free rent while eviction cases play out in D.C. Superior Court), or he winds up at a shelter or on the streets. These are not, as the district court found, "palatable options," JA0022, but they also are not the only options. Eden testified that he is seeking a reversal by the housing authority of the termination of his voucher, JA0048-0049, and if he obtains another voucher or some other funding source, he could use those resources to find an appropriate housing situation where he is less likely to harm himself or innocent third parties. Eden has demonstrated, many times over, that he is not capable of living independently, and certainly not in a community that is the home or place of employment of people he has victimized and stalked. So, while the harm to Eden in the absence of an injunction is not irreparable (it could largely be avoided if he works with DCHA and his caseworkers to secure alternative housing and could otherwise be addressed through money damages if he prevails

25

on the merits), the harm to Station House, its staff, and its residents as a

consequence of his return is inevitable.

### C.    A reasonable jury could adopt Station House's abandonment defense, and that finding would extinguish Eden's wrongful eviction claim.

Both sides recognize that, if Eden abandoned his unit prior to August 2025,

he no longer would be a tenant, and thus there would be no basis for a court or a

jury to find a wrongful eviction.  *See Int'l Comm'n on English in the Liturgy v.

Schwartz*, 573 A.2d 1303, 1306 (D.C. 1990) (discussing landlord's options in the

case of abandonment by tenant).  The district court was persuaded, at least on a

preliminary record (compiled in less than a week between the initial TRO hearing

on September 5, 2025 and the preliminary injunction hearing on September 11,

2025), that Eden is "substantially likely to prevail on that disputed issue."  JA0019.

In so holding, the Court emphasized that Eden had eviction proceedings underway

while he was detained at Saint Elizabeths, and that Station House did not

communicate with his eviction attorney about the abandonment issue prior to

Eden's release.  JA0020-0021.

The facts of the current record may be such that a reasonable jury ***could***

reject Station House's abandonment defense.  But a reasonable jury likewise could

find, under the totality of the circumstances, that Station House reasonably deemed

Eden to have abandoned his unit.  Station House's perception matters because,

while abandonment occurs "when a tenant leaves the premises vacant with the avowed intention not to be bound by his lease," *Simpson v. Lee*, 499 A.2d 889, 894 (D.C. 1985), the tort of wrongful eviction (Eden's primary claim here) would require Eden to prove that Station House "performed 'some act of a permanent character ***with the intention and effect of depriving the tenant*** of the enjoyment of the . . . premises . . . .'" *Holmes*, 267 A.3d at 1032 (emphasis added) (alteration in original) (citations omitted). If Station House reasonably concluded as of July 2025 that Eden had abandoned his unit, Station House could not have had the "intention" of "depriving" Eden of the enjoyment of his lease.

So what were the facts supporting Station House's conclusion that an abandonment had occurred? To begin, Station House learned in late July 2025 that DCHA had terminated Eden's voucher. JA0169. Back in March, DCHA had mailed notice to Station House and Eden advising that Eden had been recommended for termination from the Housing Choice Voucher Program. JA0334; JA0107. Following receipt of that notice, Eden had the right to an informal hearing, but he did not request one. JA0108. DCHA subsequently issued a Notice of HAP Contract Termination dated July 17, 2025. JA0267. That notice indicated that Eden's voucher was terminated retroactive to April 16, 2025. JA0267.

954589

Not only was Station House aware that Eden's voucher had been terminated; Station House also knew that Eden had not occupied his unit for months.  As of his August 28, 2025 return to the property, JA0168, Eden had been absent for five months, JA0161, JA0037.  Eden acknowledged that he did not contact anyone at Station House during that five-month period, JA0071-0072, despite that he placed calls to other persons outside Saint Elizabeths a few times a week, JA0071.  Eden's tenancy was month-to-month pursuant to a lease agreement he had executed back in 2020, JA0274-0275, so it wasn't as though Station House could simply wait for the conclusion of a term and then turn the vacant unit over.  Eden's "term"—if he still resided in the unit—was indefinite.

The condition of the unit provided additional evidence of abandonment.  The general manager testified that a cockroach infestation had spread from his unit into the rest of the community.  JA0161.  She entered the unit while wearing a hazmat suit, and observed no furniture except a broken bed; no food in the refrigerator; trash and debris; and extensive cockroach activity.  JA0161-0165.  In light of those appalling conditions, and following notice of the voucher termination, Station House posted an abandonment notice on July 23, 2025.  JA0167.  The notice gave Eden seven days to respond; he did not respond.  JA0167.

Eden will argue, and the district court found, that the evidence on which Station House relies for its abandonment defense was all simply a consequence of

28

Eden's involuntary commitment at Saint Elizabeths. And, obviously, while Eden was locked up, he could not clean his unit or review a posted notice—though it is not clear why Eden failed for months to even attempt to communicate with the property or check in on his unit, particularly because the DCHA termination notice was issued more than two weeks before Eden's March 2025 arrest.[5]

But the information that counsel for Station House had received, through Eden's lawyer, was nebulous at best. On June 17, 2025, Eden's counsel wrote: "Just a heads-up, Mr. Eden is still in the hospital. I expected him to be discharged a few weeks ago, but from what I've heard, he is still there." JA0336. On July 25, 2025, at a remote hearing in one of Eden's pending eviction cases, counsel "advised the court and Defendants' counsel, in response to a question about moving forward with the case: 'I'm not exactly sure how to answer, Your Honor, given that there is a field of law at play that I don't have any experience in and can't offer a good predictive model.'" JA0017. A week later, counsel wrote that if

---

[5] Eden claimed he did not receive the notice. JA0043. But Eden claimed many other things during his meandering testimony, including that "delivery guys from Nicaragua, Cuba, Honduras, [and] Venezuela" are "reconnoitering the campus of Capitol Hill," JA0178; that Eden "know[s] a little bit about pills because [he] was a vice president of the pharmaceutical industry, Pharm International," JA0040; and that he is "chummy" with a United States Senator whom he has stalked, JA0180. Due to his mental health challenges or his dishonesty (or both), Eden's testimony is not credible. *See* JA0218 (the district court observing: "I think he's unstable, unwell, and, frankly, I wouldn't want to be his neighbor either.").

Station House wanted to include Eden in a case-related conference, "I'm happy to do so, but in that case we'd need to ask the court for a continuance—he remains in the hospital." JA0338. By this point, months had passed since Eden's arrest. While Eden's counsel evidently believes that a landlord in this situation is "left to . . . the devices of the D.C. Superior Court and [the tenant's] inability to defend a case," JA0186, at a certain point any reasonable landlord would conclude that the tenant does not intend to return.

Clearly, there are many circumstances in which a tenant may abandon an apartment without providing advance notice. It is not uncommon in rental housing for a resident to "skip," leaving an apartment vacant or nearly vacant, and ceasing communications. Housing units also may be abandoned by death, incapacity, or criminal confinement or deportation. All of these fact patterns, which are not uncommon, contribute to a commonsense definition of abandonment. Search-and-seizure case law provides a helpful analog as well, as courts periodically are confronted with the question whether a tenant has abandoned his leasehold (and thus abandoned any reasonable expectation of privacy on the property). *See, e.g.*, *McKenney v. Harrison*, 635 F.3d 354, 359 (8th Cir. 2011) ("The officers found the house in disrepair, with an unkempt yard and a fence that was incomplete and falling apart. There were no vehicles parked in the driveway. No one responded when the officers knocked on the front door, and the back door

30

was open three or four inches.  Through the open door, the officers could see into the kitchen, where the cabinets were open and empty, the refrigerator was open, empty, and pulled away from the wall, and there was no furniture or personal effects.  There were no lights on, sounds from appliances, or other indications that the house had electrical power.  In light of these facts, it was reasonable for Harrison and Pollreis to conclude that the house was abandoned."); *Colón-Díaz v. United States*, 899 F. Supp. 2d 119, 130-31 (D.P.R. Sept. 20, 2012) (police were justified in searching apartment they believed to be abandoned based on condition of apartment, which "was in complete disarray with old, broken furniture and the appearance that the apartment had not been lived-in for some time"); *State v. Brauch*, 984 P.2d 703, 708-09 (Idaho 1999) ("Indicators of abandonment may include nonpayment of rent, removal of furniture, clothes, foodstuffs, and personal items, nonpayment or disconnection of utilities, statements to landlords or neighbors, and any other acts inconsistent with a tenant's control or occupation of the leased premises.").

Abandonment turns on the intent of the tenant, but wrongful eviction requires evidence of the landlord's intentions to deprive the tenant of access to the leased space—and a landlord does not manifest those intentions when the facts and circumstances indicate abandonment.  How long was Station House required, as a matter of D.C. law, to wait and see whether Eden would ever return to his

31

month-to-month tenancy?  For purposes of this litigation, it is coincidental that
Eden was deemed (tenuously) competent to stand trial in August.  It could as easily
have been weeks or months later.  His lawyer's lack of a "good predictive model"
certainly did not give the property any confidence that Eden would soon be
returning.  And while Station House perhaps could have stayed the course in D.C.
landlord-tenant court and hoped for an eventual judgment, in the meantime, it had
an unoccupied unit that had been vacant for months except for the roaches that
called it home, for which it was receiving no rent.  Under these circumstances, a
jury is not ***likely*** to conclude that Station House turned over the unit "with the
intention and effect of depriving the tenant of the enjoyment of the . . . premises,"
*Holmes*, 267 A.3d at 1032 (citations omitted), even though there are facts from
which a jury ***could*** reject Station House's abandonment defense.  That being so,
the district court erred in holding that Eden established a likelihood of success on
the merits.  But if the Court is on the fence about this issue (or even if the Court
agrees with the district court's analysis), the Court nevertheless should vacate the
preliminary injunction because Eden cannot carry the day on the equities.

954589

## CONCLUSION

The Court should vacate the preliminary injunction.

Respectfully submitted,

_____/s/ Joe Dugan_____

James D. Bragdon
Joe Dugan
GALLAGHER LLP
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
Phone:  (410) 727-7702
jbragdon@gallagherllp.com
jdugan@gallagherllp.com

Dated:  October 3, 2025          *Counsel for Defendants-Appellants Station Townhouses LLC and Bozzuto Management Company*

33

## REQUEST FOR ORAL ARGUMENT

Station House respectfully requests that the Court hear oral argument in this appeal.

## CERTIFICATE OF COMPLIANCE—FED. R. APP. P. 32(G)(1)

1.      This brief contains 7,651 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).  This brief therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

2.      This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.  This brief therefore complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6).

_____*/s/ Joe Dugan*_____
Joe Dugan


## CERTIFICATE OF SERVICE

I CERTIFY that on October 3, 2025, the foregoing brief and accompanying joint appendix will be served by CM/ECF on counsel of record, with email to the following:

Neil Satterlund, Esq.
Neighborhood Legal Services Program
64 New York Ave., NE
Washington, DC  20002
nsatterlund@nlsp.org

_____*/s/ Joe Dugan*_____
Joe Dugan

954589

# STATUTORY ADDENDUM

The following Addendum contains the citation and verbatim text of all

pertinent constitutional provisions, statutes, ordinances, rules, and regulations.

# ADDENDUM INDEX

I.      28 U.S.C. § 1332(a)................................................................ iii

II.     28 U.S.C. § 1292(a)................................................................ iv

940389

## I.      28 U.S.C. § 1332(a)

The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

    (1) citizens of different States;

    (2) citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

    (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

    (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

940389

**II.      28 U.S.C. § 1292(a)**

Except as provided in subsections (c) and (d) of this section, the courts of appeals shall have jurisdiction of appeals from:

(1) Interlocutory orders of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, except where a direct review may be had in the Supreme Court;

(2) Interlocutory orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property;

(3) Interlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed.

Add. iv

940389